UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES ARDINGO,

        Plaintiff,

v.

ROBERT POTTER and UNITED FOOD &
COMMERCIAL WORKERS, LOCAL 951,

        Defendants.

        Case No. 1:04-CV-835

        Hon. Richard Alan Enslen

        **OPINION**

_____/

        This matter is before the Court on Defendants Robert Potter and United Food and Commercial Workers, Local 951's ("Union") Motion for Summary Judgment under Federal Rule of Civil Procedure 56(c). The Motion has been fully briefed and the Court discerns no reason to hear oral argument. W.D. MICH. LCIVR 7.2(d). For the reasons set forth below, the Court will grant in part and deny in part Defendants' Motion.

I.      **BACKGROUND**

        Defendant Union is a labor organization headquarted in Grand Rapids, Michigan and Defendant Potter is its duly elected President. In 1990, the Union hired Plaintiff Charles Ardingo to serve as its business agent. In this capacity, Plaintiff's duties included supervision of Union employees and affairs, negotiating and administrating collective bargaining agreements, and organizing/recruiting potential Union members.

        In 2000, the United States Department of Labor began an investigation into the Union's finances and a grand jury was convened to consider whether any criminal wrongdoing may have occurred. Also in 2000—and in response to the investigation—the Union established a legal defense fund to reimburse its officers for legal expenses that could be not be paid out of Union funds. A

Union Vice-President asked Plaintiff to commit $5,000 to the fund, but Plaintiff contributed $1,260 instead. According to Plaintiff, the Union Vice-President stated "you know, people in my neighborhood come to the aid of other people when they're in need[,]" and because he did not contribute the requested $5,000, Plaintiff was told "things could change for [him]."

Still in 2000, Plaintiff announced his intention to run for the Union's Vice-President office. Shortly after his campaign announcement, Plaintiff claims Defendant Potter began a crusade against him to force him out of the Union. To wit, Plaintiff avers at a July 3, 2001 meeting of Union members supporting Defendant Potter's re-election bid, Defendant Potter proclaimed that Plaintiff was a traitor to Defendant Potter's staff; Plaintiff was assisting the electoral opposition; Plaintiff was assisting the Department of Labor in an unwarranted and spurious investigation; and that Plaintiff would be fired after the election. In 2001, Plaintiff was reassigned from his business agent position to work exclusively in the Union's organizing department as part of its effort to organize Wal-Mart employees. Plaintiff claims he was instructed not to contact any current Union members. Plaintiff further claims Union officers and staff were directed not to communicate with him, and he was denied access to his Union cell phone and voice mail system.

While all this was occurring, the Department of Labor's investigation of the Union's finances continued. Plaintiff cooperated with the investigation and in February 2002, testified before the grand jury. Plaintiff claims he testified that: Defendant Potter sought reimbursement from the Union for fictitious expenses; irregularities in the Union benefit plan were attributed to Defendant Potter; Defendant Potter took Union sponsored business trips to vacation destinations where no business transpired; and the Union paid for Defendant Potter's moving expenses.

In April 2002, Plaintiff was reassigned, and consistent with the Union's objective to organize Wal-Mart employees, he was directed to assist organizing campaigns in North Carolina and Indiana. In June 2003, Plaintiff was assigned the same task in Washington. Plaintiff disliked these remote assignments and complained to a Union Vice-President. On January 9, 2004, the Union informed Plaintiff he was being laid off due to financial concerns. On January 21, 2004, Plaintiff invoked his right to arbitrate that decision, to which the Union never responded.

Plaintiff then brought this lawsuit under the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. §§ 401-531 and Michigan common law, charging Defendants with four counts of liability. In support of his Complaint, Plaintiff alleged that: (1) Defendants violated his freedom of speech to comment on Union affairs, as guaranteed by the LMRDA; (2) Defendants unlawfully disciplined him for failing to make special assessment payments under the LMRDA; (3) Defendants violated Michigan public policy by terminating him; and (4) Defendants wrongfully terminated him contrary to the Union's just cause policy.

## II. LEGAL STANDARDS

Deciding a motion for summary judgment requires the Court to determine if there is no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file. *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The facts are to be considered in a light most favorable to the non-moving party, and ". . . all justifiable inferences are to be drawn in his favor." *Schaffer v. A.O. Smith Harvestore Prod.*, 74 F.3d 722, 727 (6th Cir. 1996) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted).

Once the movant satisfies his burden of demonstrating an absence of a genuine issue of material fact, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Kramer v. Bachan Aerospace Corp.*, 912 F.2d 151, 153-54 (6th Cir. 1990). The non-moving party may not rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting FED. R. CIV. P. 56(e)). It is the function of the Court to decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The question is "whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." *Id.* at 252. "The 'mere possibility' of a factual dispute is not enough," *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)), neither is the submission of *de minimis* evidence. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). It is with these principles in mind that the Court turns to Defendants' Motion.

### III.   DISCUSSION

Defendants seek summary judgment on all four counts of liability alleged in Plaintiff's Complaint. In Response, Plaintiff concedes that summary judgment is proper on his LMRDA assessment claim (Count II), and the Court will dismiss that Count without further discussion. As for Plaintiff's remaining claims, the Court finds the following.

#### A.   Exhaustion

The LMRDA permits labor organizations to require reasonable internal exhaustion requirements as a prerequisite to suit by union members in any court. 29 U.S.C. § 411(a)(4). Ordinarily, a union member's failure to pursue internal union dispute resolution measures prior to

filing suit in federal court is fatal to his claim. *Holmes v. Donovan*, 984 F.2d 732, 738 (6th Cir. 1993). Defendants contend that Plaintiff failed to properly exhaust his internal Union remedies prior to filing this lawsuit. However, as noted above, Plaintiff provided the Union with notice of his intent to arbitrate his layoff on January 21, 2004. Defendants have presented no evidence to the contrary, and thus, the Court finds that Plaintiff properly exhausted his internal Union remedies.

**B.    The LMRDA and Freedom of Speech**

"The [LMRDA] was the product of congressional concern with widespread abuses of power by union leadership." *Finnegan v. Leu*, 456 U.S. 431, 435 (1982). The LMRDA's primary aim was to ensure that labor organizations were governed democratically and were responsive to the will of their rank-and-file members. *Id.* (citations omitted). To that end, the LMRDA affords union members various protections styled after the federal Constitution, which are listed in Title I of the Act, 29 U.S.C. §§ 411-15, and carry the caption "Bill of Rights of Members of Labor Organizations." *Id.*

> Within the LMRDA Bill of Rights is the right of every member of a labor organization to:
>
> [M]eet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided*, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(2) (emphasis in original). Furthermore, a labor organization cannot fine, suspend, expel, or otherwise discipline any of its members "unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; [and] (C) afforded

a full and fair hearing." *Id.* § 411(a)(5). Plaintiff contends that he was otherwise disciplined by Defendants for exercising his free speech rights in contravention of sections 411(a)(2) and (a)(5).

To establish a *prima facie* case under section 411, Plaintiff must prove that: (1) he engaged in free speech as defined and protected by the LMRDA; (2) the Union took adverse action against or otherwise disciplined him; and (3) he suffered an injury as a proximate result of the Union's adverse action. *Black v. Ryder/P.I.E. Nationwide Inc.*, 970 F.2d 1461, 1469 (6th Cir. 1992); *McMillan v. Potter*, No. 1-04-CV-836, 2006 WL 2022527, at *5 (W.D. Mich. July 17, 2006); *Williams v. United Steel Workers of Am. AFL-CIO/CLC*, 234 F. Supp. 2d 542, 549 (M.D. N.C. 2002).

Defendants maintain that the Union (as an entity) did not discipline Plaintiff and it took no adverse action against him. Rather, any adversity Plaintiff suffered was solely at the hands of Defendant Potter. For this, Defendants rely chiefly on the Supreme Court's decision in *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67 (1989). In that case, the Court reviewed Breininger's claim that he was retaliated against by his union business manager and business agent by refusing to refer him employment because he supported their political rival. In rejecting Breininger's claim that he had been disciplined by his union, the Court began by observing that "Congress did not intend to include all acts that deterred the exercise of rights protected under the LMRDA, but rather meant instead to denote only punishment authorized by the union as a collective entity to enforce its rules." *Id.* at 91. Union discipline "refers only to actions 'undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership.'" *Id.* (citations omitted). The Court found persuasive the fact that Congress enumerated certain types of punishment (fine, expulsion and suspension), which require

"some sort of established disciplinary process rather than *ad hoc* retaliation by individual union officers." *Id.* at 91-92. The Court further clarified that it did:

> [N]ot imply that "discipline" may be defined solely by the type of punishment involved, or that a union might be able to circumvent §§ 101(a)(5) and 609 by developing novel forms of penalties different from fines, suspensions, or expulsions. . . . [W]e do not hold that discipline can result only from "formal" proceedings, as opposed to "informal" or "summary" ones. We note only that Congress' reference to punishments typically imposed by the union as an entity through established procedures indicates that Congress meant "discipline" to signify penalties applied by the union in its official capacity rather than *ad hoc* retaliation by individual union officers.

*Id.* at 92 n.15. The Court ultimately held that Breininger "was the victim of the personal vendettas of two union officers. The opprobrium of the union *as an entity*, however, was not visited upon petitioner" and accordingly no LMRDA claim can follow. *Id.* at 94 (emphasis in original).

The Sixth Circuit further shaped the contours of union discipline in *United Food & Commercial Workers v. United Food & Commercial Workers Int'l Union*, 301 F.3d 468 (6th Cir. 2002). In that case, the Court of Appeals found that the international union president's decision to assign a new store to another local union—instead of the plaintiff local union—did not amount to discipline under the LMRDA. The plaintiff local union alleged that the international union president retaliated against it for its aggressive posture during recent negotiations with an employer. *Id.* at 473. In applying *Breininger*, the court recognized that although the Supreme Court did not intend to limit its definition of punishment to the enumerated penalties listed in section 411(a)(5) and that novel forms of punishment are indeed covered by the LMRDA, the international union president's decision more closely resembled "*ad hoc* retaliation than . . . 'punishment authorized by the union as a collective entity to enforce its rules.'" *Id.* The court also found compelling the fact that the

international union president did not undertake any formal disciplinary action and did not fine, suspend, or expel any local union member. *Id.*

More recently in *Webster v. United Auto Workers, Local 51*, 394 F.3d 436 (6th Cir. 2005), the Court of Appeals reviewed an elected union officer's claim that he was disciplined by his union for voicing opposition to ratification of a proposed collective bargaining agreement. Webster alleged that other union officers, who were in favor of the agreement, mounted a pamphleteer campaign to disparage him in retaliation for his views. The court found that Webster "was the target of the kind of *ad hoc* retaliation by individual union officials that is not subject to the protections of the Act." *Id.* at 441.

In this case, the holdings of *Breininger*, *United Food & Commercial Workers*, and *Webster* are materially indistinguishable. Plaintiff believes that because he was reassigned from his position as Union business agent to organizer; directed not to communicate with stores already organized; Union officers and staff were instructed not to interact with him; and denied access to his Union cell phone and voice mail system, he has been disciplined. The Court disagrees.

Any adversity Plaintiff suffered was solely the product of Defendant Potter, not the Union, and is the kind of *ad hoc* retaliation by an individual officer that goes uncovered by the Act. *Breininger*, 493 U.S. at 92 n.15; *Webster*, 394 F.3d at 441. Defendant Potter's retaliation against Plaintiff had nothing to do with enforcing Union rules, *Breininger*, 493 U.S. at 91, and it was designed to frustrate Plaintiff's efforts to uncover Defendant Potter's alleged financial impropriety and/or stymie Plaintiff's campaign for Union office. By retaliating against Plaintiff, Defendant Potter sought only to protect himself and did not act to protect the interests of the union or its

membership. *Id.* Furthermore, Plaintiff was not subject to any formal disciplinary action. *Id.* at 91-92.

Plaintiff makes much of the fact that Defendant Potter acted in his official capacity and—under the authority of his office—sought to silence his speech and stall his election bid. Therefore, Plaintiff attributes Defendant Potter's conduct and the Union to be one and the same. Even granting Plaintiff that logical leap, in *United Food & Commercial Workers*, the Sixth Circuit reviewed the international union president's behavior and found it to be unprotected, individual *ad hoc* retaliation. 301 F.3d at 473. The court, presumably, was unconcerned with the international union president's authority to act on behalf of the union. Furthermore, other circuit courts of appeals have found such representative authority arguments insufficient to allege collective action by the Union. *See Bullock v. Dressel*, 435 F.3d 294, 299 (3rd Cir. 2006); *Linnane v. Gen. Elec. Co.*, 948 F.2d 69, 72 (1st Cir. 1991). The most salient feature of union discipline is collective action by the union as an entity through some sort of established disciplinary process. *Breininger*, 493 U.S. at 91. Unfortunately, the facts of this case evidence that Plaintiff was the victim of *ad hoc* retaliation by Defendant Potter. Accordingly, Plaintiff has not shown that the Union disciplined him and summary judgment is appropriate on his LMRDA free speech claim.

### C. Wrongful Discharge Against Michigan Public Policy

Ordinarily, employers and employees enjoy an at-will relationship, meaning the employee can quit or be fired at any time—for any or no reason—subject to certain delimited public policy exceptions. *Suchodolski v. Mich. Consol. Gas Co.*, 316 N.W.2d 710, 711 (Mich. 1982) (citing *Toussaint v. Blue Cross & Blue Shield of Mich.,* 292 N.W.2d 880 (Mich. 1980)). In order to state a claim of wrongful discharge against Michigan public policy, Plaintiff must demonstrate that he

suffered an adverse employment action because of a law he refused to violate, a duty he was obligated to discharge, or a right he was entitled to exercise. *Suchodolski*, 316 N.W.2d at 711-12.

Plaintiff's theory of wrongful discharge against Michigan public policy is that he was discharged for exercising his free speech rights under the LMRDA. However, "[a]s a general rule, the remedies provided by statute for violation of a right having no common-law counterpart are exclusive, not cumulative." *Dudewicz v. Norris-Schmid Inc.*, 503 N.W.2d 645, 649 (Mich. 1993). The Court is unaware of any common law right to be free from reprisal when commenting on matters concerning a labor organization. Therefore, the Court finds that the LMRDA provides Plaintiff's exclusive remedy for any retaliation generated by his free speech. Consequently, summary judgment is appropriate on his wrongful discharge against Michigan public policy claim.[1]

### D. Wrongful Discharge in Contravention of the Union's Just Cause Policy

An employment contract for an indefinite duration is presumptively terminable at the will of either party for any reason, or for no reason at all. *Rood v. Gen. Dynamics Corp.*, 507 N.W.2d 591, 597 (Mich. 1993) (citations and footnotes omitted). "To overcome the presumption of employment at will, a party must present sufficient proof either of a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause." *Id.* (citations and footnotes omitted).

---

[1] Plaintiff also suggests that because he refused to donate the requested amount to the Union's legal defense fund, he was retaliated against in violation of Michigan's Wage and Fringe Benefits Act. MICH. COMP. LAWS § 408.478. The record discloses, and Plaintiff concedes in earlier portions of his brief, that contributions to the fund were voluntary. Consequently, the policy behind the Wage and Fringe Benefits Act is not implicated here because the Act is designed to prohibit mandatory payments (*i.e.*, kickbacks) as a condition of employment.

The Union "admits that it has a policy entitled 'Just Cause and Arbitration,'" (Def. Union's Answer ¶ 9); however, Defendants assert that Plaintiff was not terminated. Rather, Defendants contend that Plaintiff was simply laid off, and thus, cannot raise a claim of wrongful termination in violation of the Union's just cause policy. *See Leadon v. Detroit Lumber Co.*, 64 N.W.2d 681, 682 (Mich. 1954). Plaintiff notes, however, that after he was laid off, the Union offered him a severance package, suggesting his layoff was a permanent decision and Defendants had no intention of recalling his employ. (*See* Pl.'s Dep. 74). As such, the Court finds that material issues of fact pervade and summary judgment is inappropriate. Thus, the Court will deny Defendants' Motion on this ground.

Alternatively, Defendants maintain that the Union's declining membership and revenues supplied it with cause for Plaintiff's layoff/termination. Plaintiff has presented competent evidence that calls Defendants' contention into doubt and suggests the Union's fisc, despite declining membership, has reposed on an even keel for several years. Accordingly, the Court will deny Defendants' Motion for Summary Judgment on Plaintiff's wrongful discharge in contravention of the Union's just cause policy claim.

## IV.   CONCLUSION

Therefore, the Court will grant in part and deny in part Defendants Robert Potter and the Union's Motion for Summary Judgment. A Partial Judgment consistent with this Opinion shall enter.

Dated in Kalamazoo, MI:                     /s/Richard Alan Enslen
August 8, 2006                              Richard Alan Enslen
                                            Senior United States District Judge